Robert P. Schuster (WSBN 4-1137)
Bradley L. Booke (WSBN 5-1676)
ROBERT P. SCHUSTER, P.C.
250 Veronica Lane, Suite 204
Jackson, Wyoming 83002
Telephone: 307.732.7800
bob@bobschuster.com
brad@bobschuster.com

Laurence O. Masson (CSBN 87794)
LAW OFFICE OF LAURENCE O.
MASSON
2625 Alcatraz Ave., No. 206
Berkeley, California 94705
Telephone: 510.735.9691
lomlex@gmail.com
(*Pro Hac Vice Applicant*)

Thomas N. Long (WSBN 5-1550)
Aaron J. Lyttle (WSBN 7-4726)
LONG REIMER WINEGAR
BEPPLER LLP
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82003
Telephone: 307.635.0710
tlong@lrw-law.com
alyttle@lrw-law.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ANDREW J. JOHNSON, an individual )<br><br>Plaintiff. )<br>v. )<br><br>CITY OF CHEYENNE, a municipal )<br>corporation; DOE 1, the personal )<br>representative of the decedent's estate of )<br>George W. Stanford, an individual; )<br>ALAN W. SPENCER, an individual; )<br>DOES 2 through 20, inclusive; )<br><br>Defendants. )<br>) | Civil No. 17-CV-74-J |

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

---

For his claims for relief against the defendants, Plaintiff Andrew J. Johnson---by and

through his counsel---states and alleges upon information and belief as follows:

## I.   **INTRODUCTION**

1.      Andrew J. Johnson ("Plaintiff" or "Mr. Johnson"), now 67 years old, was imprisoned for nearly twenty-four (24) years for crimes he did not commit.  In September 1989, he was tried and convicted of aggravated burglary and first degree sexual assault of Laurie Slagle ("Ms. Slagle"), a 24-year-old Caucasian woman, in an apartment in Cheyenne, Wyoming.  The case was *Wyoming v. Johnson* (Docket No. 19-373, Wyo. Dist. Ct. First Judicial District), *aff'd sub nom. Johnson v. State*, 806 P.2d 1282 (Wyo. 1991).  At the time, DNA analysis of rape kit biological samples was in its infancy and not meaningfully available to Mr. Johnson for use in his defense.

2.      More than two decades later and with the aid of the Rocky Mountain Innocence Center, Mr. Johnson was the first prisoner to use Wyoming's newly enacted DNA testing statute, W.S. § 7-12-303(b), to present compelling and conclusive new evidence of his innocence, to have his convictions set aside, and to regain his freedom.  In early 2013, the Wyoming State Crime Lab determined that the seminal fluids samples from Ms. Slagle's rape kit did not match Mr. Johnson's DNA.  He was declared actually innocent by Court Order dated August 7, 2013. The new evidence affirmatively showed that the actual perpetrator was Ms. Slagle's purported fiancé or boyfriend, Barney Haggberg ("Mr. Haggberg"), a 33-year-old Caucasian male, whose DNA matched Ms. Slagle's sexual assault kit seminal fluid samples.

3.      Ms. Slagle was prompted or encouraged by one or more law enforcement officers to say, and did say, Mr. Johnson sexually assaulted her in the apartment she shared with Mr. Haggberg at that time.

4.      At that time, the Cheyenne Police Department ("CPD") failed to have in place and/or to monitor and enforce any customs, policies, procedures, or practices to document, log, and effectively preserve all first-responder crime scene photos and other forensic photos, thereby

allowing and causing one or more of its personnel to launder and suppress some crime scene film and photos taken by one of the crime scene original responders, CPD officer Phillip Raybuck (badge # P-8) ("Officer Raybuck"). Plaintiff is informed and believes, and on that basis alleges, that a full set of the crime scene photos would have tended at trial to show Ms. Slagle was lying, or at least not credible, and that other testifying CPD officers were not credible.

5.      The CPD's failure in regard to police crime scene forensic photograph handling, processing and safe-keeping allowed either CPD's detective George W. ("Bill") Stanford (badge # D-2) ("Detective Stanford") and/or CPD's patrolman Alan Wade Spencer (badge # P-46) ("Defendant Spencer" or "Patrolman Spencer") who was the other crime scene first-responder, and/or other CPD DOE defendants whose names are presently unknown, to violate Mr. Johnson's constitutional right(s) to full disclosure of material exculpatory or impeaching, apparent exculpatory or impeaching, and/or potentially useful photographic evidence obtained by CPD.

6.      It is presently unknown whether the missing negative film and/or missing photograph prints therefrom have been misplaced, purposely or inadvertently destroyed, purposely or carelessly sequestered, lost, or something else improperly done with this forensic evidence, or some of it, by defendants or by one or more of them.

7.      Plaintiff is informed and believes, and therefore alleges, that CPD and one or more of its personnel failed to provide to the prosecutor and to Plaintiff's criminal trial counsel photographic crime scene evidence which was materially exculpatory or impeaching, apparently exculpatory or impeaching, and/or potentially exculpatory or impeaching in violation of Plaintiff's Fourth and Fourteenth Amendment rights under the U.S. Constitution. Other constitutional violations also occurred from other unlawful conduct.

## II.    JURISDICTION AND VENUE

8.    The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. §§ 1331 & 1343; and 42 U.S.C. § 1983.

9.    Venue is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in Wyoming.

10.    Mr. Johnson's federal claims arise under the United States Constitution, and at least the Fourth and Fourteenth Amendments thereto, and under federal law, including but not limited to the Federal Civil Rights Act, Title 42 of the United States Code, §§ 1983 & 1988.  The acts and omissions of defendants and others as alleged herein were committed by defendants and others, and each of them, under color and pretense of the Constitution, statutes, ordinances, rules, regulations, practices, customs, patterns, and usages of the State of Wyoming and/or of the County or City referenced herein.

## III.    THE PARTIES

11.    Raised in Cheyenne since age five, Mr. Johnson, who is African-American, was at all relevant times a United States citizen and a resident of Laramie County, Wyoming.

12.    Defendant City of Cheyenne ("City" or "Defendant City") was at all relevant times a public entity, a chartered "first class city" of Wyoming, and a municipal corporation located in Laramie County, Wyoming.  Plaintiff is informed and believes, and on that basis alleges, that CPD is an unincorporated department of Defendant City and that at all relevant times CPD was authorized to act for, and did act for and on behalf of, Defendant City.  CPD was and is City's principal criminal law enforcement agency.  At all relevant times, CPD was responsible for providing sworn peace officer services to the people of Defendant City.  At all relevant times, Defendant City delegated to CPD all policymaking authority regarding CPD

practices and procedures for criminal law enforcement for the City and further delegated to CPD all or major responsibility for the training and supervision of CPD personnel.

13.     DOE 1 is or was the personal representative of the estate of Detective Stanford who passed away on or about August 13, 2007. Insofar as Plaintiff would have named Detective Stanford, were he still alive, as a defendant in this action in his individual capacity, Plaintiff hereby sues DOE 1 in his or her representative capacity instead of and in place of Detective Stanford.

14.     At all relevant times, Defendant Spencer was a CPD peace officer employed by Defendant City. As of September 1989, when he was called by the prosecutor and testified under oath in Mr. Johnson's criminal case, Defendant Spencer had been a CPD peace officer for approximately four and a half years. Defendant Spencer is sued in his individual capacity.

15.     DOES 2 through 20, inclusive, are other individuals or entities responsible in some way for the deprivation of federal rights and the unlawful actions or inactions injuring Plaintiff as complained of herein. In most instances, the names and capacities of these DOE defendants are presently unknown to Plaintiff. In several instances Plaintiff is aware of the name or capacity of such DOE defendant, but Plaintiff believes he presently possesses insufficient information to reasonably justify suing such person or entity as a named defendant. Therefore, at this time, Plaintiff sues these defendants under fictitious names, DOES 2 through 20, inclusive, and will amend this Complaint to allege their true names and capacities when ascertained and appropriate.

16.     Except where otherwise noted, defendants who are natural persons, and each of them, engaged in the acts and conduct complained of herein while within the course and scope of their agency or employment by or for Defendant City, or by or for a department or office or

agency of City, or otherwise were acting for or on behalf of Defendant City, or one of its departments or offices or agencies, or other departments or offices or agencies of Laramie County, Wyoming, or the State of Wyoming, and under color of state law in doing or not doing the things complained of herein.

## IV.   FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A. The 911 Call.

17.    On Sunday, June 11, 1989, shortly before 3:19 a.m., a CPD dispatcher received a 911 call from Julia Prodis ("Ms. Prodis"), who occupied the 2nd floor apartment in the 3-story house at 515 E. 18th Street (the "House") in Cheyenne. Sometime in the past, the House had been converted into four apartments. In June 1989, Mr. Haggberg and Ms. Slagle rented the 3rd floor apartment ("Attic Apartment"), which was accessed by a ground-level doorway on the House front-right side. This doorway gave way to an interior staircase leading to a 2nd floor landing where a second door with a large window pane and lock ("Landing Door") accessed steep stairs directly into the Attic Apartment. The Attic Apartment address was 513 E. 18th Street.

18.    Ms. Prodis had been awakened by very aggressive, loud knocking she heard on the Landing Door to the Attic Apartment. The door pounding stopped and started approximately six (6) times over the course of approximately 10 minutes. Then Ms. Prodis heard the crashing sound of broken glass, footsteps crossing broken glass, and someone going upstairs to the Attic Apartment. The footsteps immediately above her sounded as if someone was going from one room to another in the Attic Apartment. Eventually, Ms. Prodis heard above her a woman's muffled, high-pitched scream sounding something like "no, no!" Ms. Prodis heard no words spoken by the intruder.

19.     Upon hearing the scream, Ms. Prodis immediately called 911, seeking police assistance. She was still on the phone with the CPD dispatcher when she heard the intruder walking down the Attic Apartment stairs, over broken glass, and apparently out the ground-floor door of the Attic Apartment. Ms. Prodis testified at Mr. Johnson's criminal trial that she estimated that the intruder was in the Attic Apartment less than ten minutes and that she never saw the intruder. Ms. Prodis also estimated that the police arrived less than a minute after the intruder had left.

**B. The Police First-Responders' Initial Actions.**

20.     At 3:19 a.m. Sunday June 11, 1989, CPD dispatched Patrolman Spencer to the House. At 3:21 a.m., CPD also dispatched Officer Raybuck to backup Patrolman Spencer. Officer Raybuck arrived first. He reported that he entered through the House's ground floor door leading up to the Attic Apartment, and when he got to the stairwell's 2nd floor landing, he observed that the Landing Door "had been broken and was standing ajar." He then proceeded up the stairway to the 3rd floor, and nearing the top, yelled: "Police anyone here?" At that moment, Defendant Spencer arrived, and Officer Raybuck subsequently reported: "[W]e entered the [Attic] [A]partment, the bathroom door opened partway and we heard a woman sobbing 'is he gone? is he gone?'"[1]

21.     Defendant Spencer testified at Mr. Johnson's criminal trial that he and Officer Raybuck had drawn their guns by the time they got to the top of the Attic Apartment stairs. No indoor lights were on. He stated aloud that they were police officers and asked: "Is anybody in the house?" No response came at that time. Standing at the top of the Attic Apartment stairs, Patrolman Spencer could see a doorway, approximately five feet to the right from the top of the

---

[1] Officer Raybuck was not called to testify at Mr. Johnson's criminal trial.

stairs, cracked open with a light on. He could hear the person behind the door "whimpering and muffled yells and hysterics." "We asked that person to come out several times. At times we didn't get no response. At other times we just heard screaming and yelling." Then Defendant Spencer testified that he determined the person behind the door was saying: "Is he still here? Is he still here?" Spencer further testified: "To me that gave indications that there might be somebody else still in the area. Since it was in the bathroom, I had a good idea they weren't coming out. [Turning on apartment lights], [m]yself and Officer Raybuck searched the apartment at that time, him going over one end and I the other. We went through the house, checking any space that a person could be hiding."

    22.     Under questioning by the prosecutor, Defendant Spencer testified:

> Q. What rooms did you go into?
> A. Down the hallway. Officer Raybuck at that time went through the bedroom. *I went into the living room and came back* (emphasis added). There's a room over, across from the hallway, a study of some type. Officer Raybuck came back through and we went in the kitchen there and went back towards the bathroom.

    23.     Defendant Spencer's testimony continued: "And at that time we went back to the bathroom, [I] stated that there was nobody in there, 'You can open the door.' She had peered out, and she had seen it was police officers, and we started talking to her from there." "I was getting bits and pieces. She had stated that 'He had hurt me. He hurt me.' I asked her, 'Who hurt you?... She had opened the door, but she hadn't come out all the way... Physically, her hair was mussed. She was wearing a robe that tied. It was half undone. I could see that her eyes were wet and red."

    24.     The prosecutor's questioning of Patrolman Spencer and his answers continued:

Q. Now, you asked her who it was – when she said "He hurt me," you asked "Who hurt you?"; is that correct?

A. That's correct.

Q. Did she respond to you?

A. Yes, she did.

Q. Who did she say hurt her?

A. She said, "A.J."

Q. Did you press her for further details, further explanation as to who this "A.J." was?

A. I'd asked her, "What is his last name?", and she said she didn't know his last name.

Q. What next happened as you are trying to talk with her in the doorway, to find out what happened?

A. As I was talking to her, I had glanced down on the ground, right there at my feet I noticed a driver's license or an identification card in a plastic-type container. I then reached down and picked it up. On one side there was an identification card. There was also, I think, a driver's license in there. It was a picture I.D., of that type. I looked at the card and it said Andrew J. Johnson on it. I held it, and as I held it I showed it to her and asked, "Is this the A.J. that you're talking about?"[2]

Q. Did she respond to you?

A. Her response – at first she didn't say anything, she just went back into hysterics when she looked at the picture. Eventually she shook her head, and I asked her again, and she said, "Yes, that's A.J."

25.    In truth, on the living room coffee table in the Attic Apartment the evening of or after midnight June 10, 1989, Mr. Johnson had used the single, clear plastic sleeve enclosing his Driver's license and picture I.D. card ("Plastic Sleeve") to separate marijuana leaves from other debris (stems, seeds, dirt, etc.), and he rolled two marijuana joints. Ms. Slagle then smoked the

---

[2] Later in his direct testimony, Patrolman Spencer was asked and he answered: "Q. How was it that you noticed that I.D. there in the doorway? A. I kicked it up with my foot."

joints with Mr. Johnson and drank Lancers wine with him in her living room.  When Mr.

Johnson and Ms. Slagle thereafter left the Attic Apartment to go to bars in downtown Cheyenne,

he inadvertently left the Plastic Sleeve with cards showing his identity on or near the marijuana

detritus sitting in a box top on the coffee table with the Lancers wine bottle.  Neither Patrolman

Spencer nor any other law enforcement personnel, nor Ms. Slagle, ever disclosed to Mr.

Johnson's criminal trial counsel the marijuana smoking, the Lancers wine drinking, the related

marijuana physical evidence, or the Plastic Sleeve identification resting on the coffee table in the

Attic Apartment.

26.     Questioned by the prosecutor, Patrolman Spencer continued:

Q:  We're back to that point in time where you had just noticed that
identification, those I.D. cards that you made reference to.  You reached
down and picked them up, showed them to the woman still you only knew
as the woman.  You still did not know her name?

A.  No, I did not.

Q.  You indicated that when she saw those she became even more
hysterical?

A.  Yes, she did.

Q.  How long did it take her to calm down, before she could begin
conversing with you again to answer your question, "Is this the A.J. you're
talking about?"

A.  Basically, from that point in time she started making reference, "Are
you sure nobody is still in here?"  And myself and Officer Raybuck, we
did try to get her to calm down.  In order to try to get her to calm down,
we went through and searched the apartment again and she went with us.

Q.  Okay. So you assured her, as you walked through each and every
room with lights on, that nobody was there?

A.  Yes.

Q.  Did that help calm her down any?

A. Yes, it did.

Q. What then happened after that?

A. Then we went into the living room, and at that point I had asked her what her name was, and tried to get an idea of what had gone on.

* * *

Q. So you are in the living room and you finally got her calmed down. Is that when you first learned her name was Laurie?

A. Uh-huh.

Q. What did you then do?

A. I started talking to her, trying to get indications on what had happened. She was still -- got bits and pieces of information. She was still hysterical and crying, not as bad as before, but to the point that she was --it was hard for her to talk because she was choked up and stuff. So at that point I was just getting bits and pieces of information on who was there, and indications she was possibly sexually assaulted at that time from her.

Q. Okay. Upon receiving that information, what did you then do?

A. Officer Raybuck, I had asked him to stay with Laurie so that I could go down and talk with the original person who had called the police department at the beginning. So I proceeded and went down and talked to Julia, talked to the lady that lived downstairs. Julia Prodis, I think is the name.

## C. First-Responder Crime Scene Photographing.

27.    Officer Raybuck did the initial forensic collection of photographic evidence at the Attic Apartment stairs, Landing Door, and living quarters (collectively "Crime Scene") in the early morning of June 11, 1989, after Patrolman Spencer took Ms. Slagle to Memorial Hospital in Cheyenne for medical examination and for taking rape kit samples. As of that time, Officer Raybuck had been a CPD peace officer for approximately 10 years.

28.    Then, as now, the *sine qua non* of crime scene investigation photography is to follow a standard procedure. Based on his training and experience, Officer Raybuck did so the

early morning of June 11, 1989.  The Crime Scene having been cleared, Officer Raybuck went

back to his patrol car to get his crime scene kit out of the trunk, loaded a cassette of unexposed

color negative film into a 35mm camera with flash, called the CPD dispatcher to get the CPD

case investigation number, and wrote a case-identifier card showing both the CPD case number--

-89-55912---and his badge number, P-8.

29.     Using the loaded 35mm camera with flash, at the beginning of the film roll,

Officer Raybuck photographed the case-identifier card he had prepared.  This procedure sought

to ensure that this specific 35 mm film cassette roll and corresponding negatives and print photos

were linked to the CPD investigation file, Case No. 89-55912.

30.     For the forensic photographing, following his standard practice Officer Raybuck

first photographed the front outside of the House, showing the initial point of entry leading to the

Attic Apartment.  When subsequently interviewed on February 10, 2015 by Plaintiff's counsel

and shown a print photo of the front of the House, Officer Raybuck said he did recall the

House's staircases leading up to the Attic Apartment and recalled photo-taking the ground-level

point of entry using the 35-mm camera with flash back in 1989.

31.     It is presently unknown whether the next immediate sequence of photos taken by

Officer Raybuck on June 11, 1989, was of doorway/stairwell shots leading up to the Attic

Apartment or of photos of the Attic Apartment's living quarters.  In any event, following his

standard procedure at that time and again using his 35mm camera with flash, Officer Raybuck

photographed the rooms of the Attic Apartment from different angles, including but not limited

to the bedroom, bathroom, and living room.  Officer Raybuck is presently not sure whether he

also took Polaroid photos of some of the Crime Scene on June 11, 1989. Typically, as a first-

responder backup, Officer Raybuck took one full roll of 35mm film per each crime scene and victim.

### D. The Crime Scene Film and Photographic Evidence.

32.     Plaintiff is informed and believes, and thereon alleges, that defendant City, through CPD, ultimately provided to the Laramie County District Attorney and thence to Plaintiff's criminal trial counsel, twenty-six and only twenty-six Crime Scene photo prints in Mr. Johnson's criminal case.  Of these 26 photos, only 6 were taken by first-responder Officer Raybuck who Plaintiff is informed and believes, and thereon alleges, shot a full roll of 35 mm color film consisting of at least 24 to 36 photo negatives---shot first at the Crime Scene before the sun rose at 5:26 a.m. the morning of June 11, 1989---and then ending with taking photos of Ms. Slagle at Cheyenne's Memorial Hospital that day.  Officer Raybuck's contemporary written report of his actions on June 11, 1989, in part explains: "When Spencer returned [from talking with Julia Prodis], I assisted Slagle to gather up some clothing to take to the hospital with her.  I then took photos of the broken door glass and the floor by the door.  I then went to Memorial Hospital where I took photos of bruises and scratches on Slagles [sic] arms and inner thigh....  The film that I used was given to P-46 to be placed in evidence."

33.     Plaintiff is informed and believes, and on that basis alleges, that Officer Raybuck prepared a handwritten log of the Crime Scene photos he took on June 11, 1989, and that the handwritten log has since been destroyed, misplaced, or lost, all of which was never disclosed by CPD to Plaintiff's criminal trial counsel.

34.     Plaintiff is informed and believes, and thereon alleges, that the other 20 Crime Scene photos provided by CPD to the prosecutor, and thence to Mr. Johnson's criminal trial counsel, were not taken by Officer Raybuck but were taken by or on behalf of CPD at times

presently unknown to Plaintiff. On at least one such subsequent occasion, the Crime Scene photographing was done by or with the assistance of CPD patrolman Donald J. Edwards (badge #P-41). One of these 20 photo prints shows a hand-held CPD case identifier-card on which is hand-written: "89-55912 513 E 18th St.  Special For D.A.  Photo P-41."

35.    No written CPD report, stating when and who took these other 20 Crime Scene photos, was ever provided to or made available to Plaintiff's criminal trial counsel. Plaintiff is informed and believes, and on that basis alleges, that no such contemporary written CPD report was ever made, or if made has since been lost or destroyed by CPD.

36.    At all relevant times, Mr. Johnson's criminal trial counsel was unaware that CPD had failed to disclose a full set of Crime Scene peace officer first-responder photos taken on June 11, 1989. At all relevant times, Mr. Johnson's criminal trial counsel was unaware that CPD had failed to disclose all Crime Scene forensic photos taken by on behalf of CPD.

### E.  The Story Ms. Slagle Told.

37.    Sometime between approximately 7:00 - 8:00 p.m. on June 10, 1989, Ms. Slagle drove herself to Jesse's Cowboy Bar ("Jesse's") in Cheyenne. She was frustrated. Earlier that evening, she stated she attempted without success to speak by telephone with Mr. Haggberg, whom she "hadn't heard from [] for two weeks" and whom she believed was in Rock Springs, Wyoming, according to her trial testimony. Mr. Haggberg, a billboard painter employed by CBS Signs, had been traveling and working outside of Cheyenne for two weeks.

38.    For a while at Jesse's that evening, Ms. Slagle drank, talked, and had a good time with two acquaintances, Jerry Manatowogee and Rose Ann. Over about a three-hour period, Ms. Slagle drank a total of five beers. Sometime around or after 10:00 p.m., Mr. Johnson walked into Jesse's. Ms. Slagle had previously met Plaintiff through Mr. Haggberg---he "was a really good friend of Barney's" according to her trial testimony. She and Mr. Haggberg had on at least one

prior occasion socialized with Plaintiff and his girlfriend, Annette Arias. Ms. Slagle described

Plaintiff that evening of June 10, 1989 at Jesse's as "emphatic about something… and he told me

that he and his girlfriend had just broken up, and I wanted to know why… And I couldn't

understand why he had done such a thing, because I thought she was really neat." "I had told

him, you know, we would go have a drink and talk about this."

39.     According to Ms. Slagle, she and Plaintiff then agreed to go to two other bars in

Cheyenne, the Mayflower and the Cheyenne Club.  But first Ms. Slagle said she needed to return

to the Attic Apartment to get her I.D. and more money.  She then drove Mr. Johnson to the

House in her car where, according to her testimony, he went into the living room and sat in a

chair while she searched for her I.D.

40.     On direct exam by the prosecutor, her trial testimony continued:

> Q.  Did Mr. Johnson---did A.J., as you knew him---I'm sorry, did A.J.
> ever leave that chair that you saw him go and sit down in in the living
> room?
> A.  No, he didn't.
> Q:  Did you keep an eye on him?
> A.  Yes, I did.
> Q.  And you never saw him leave that chair?
> A.  No.
> Q.  Okay.  You were then walking around in your house?
> A.  First, I walked into the living room, and I looked on the living room
> table for my I.D. and it wasn't there, and then I went to the bathroom to
> get my birth certificate out.  And I looked in my purse and it wasn't in
> there.  I went back in the living room and threw my purse down on the
> love seat, and then I went into the bedroom and I looked behind the
> headboard in the bedroom, because sometimes Barney puts the checkbook
> there, and it wasn't there either.  And I finally went back into the living

room and I told A.J. that, you know, I didn't have my I.D.  He said,

"That's okay, they know me."

Q.  Then what did you do?

A.  Then we left there and went to, I believe the Cheyenne Club first.

Q.  Okay.  So when you walked out in the living room and said "I can't

find my I.D. anywhere," did you and he both walk straight down the

hallway and down and out of the apartment?

A.  Yes, we did. He walked out first, because we have a really tricky

staircase, and sometimes, if there's not a light on, you know, you could

end up falling down. You have to be careful or you could get seriously

hurt.

41.     At that point, Ms. Slagle told Plaintiff to drive them in her car to the Cheyenne

Club because "I pretty much had enough, you know, to drink, that I shouldn't have been driving,

and if I had drove downtown there would be busy traffic and I didn't want to wreck the car.... I

probably shouldn't of had anything else to drink.  I was pretty well legally intoxicated."

42.     Well before Mr. Johnson's criminal trial, CPD had requested of the Wyoming

State Crime Lab drug-testing and blood-alcohol level testing of blood samples taken from Ms.

Slagle and Mr. Johnson on June 11, 1989.  No drug-test results were ever communicated in any

way to Plaintiff's criminal trial counsel, though blood-alcohol test results were.

43.     On June 11, 1989, Ms. Slagle and Mr. Johnson stayed at the Cheyenne Club

"[j]ust for a few minutes... and then went across to the Mayflower" where, according to Ms.

Slagle, Plaintiff had either to show his I.D. card or to pay a cover charge, pulling from his back

pocket "his I.D. card."  Her trial testimony on direct examination by the prosecutor continued:

Q. And you're sure that happened downtown?

A. Yes, I'm sure.

Q. No doubt in your mind at all?

A. No doubt about that.

Q. Now, even though you had been drinking earlier, there was no possibility that your memory was clouded?

A. At that point my memory was not clouded.

* * *

Q. How long were you at the Mayflower?

A. Just a few minutes.

* * *

Q. So you left the Mayflower. Where did you go then?

A. Then I think we went to---well, we went to this building, and he [Plaintiff] got out and said "We will wait here." And I had gotten sick. And that when he said "Well, just hang around," and he ran into the building. When I got done getting sick, I had climbed over into the driver's seat and put it in gear and then drove home.

* * *

Q. Okay. Do you know the name of the place that it was that A.J. stopped and went inside?

A. No, I don't.

Q. And do you know if---do you recall telling him that you were going to stay or leave when he said "Wait right here, I will be right back?"

A. I didn't say anything.

Q. Okay. After you had gotten sick, was A.J. anywhere to be seen?

A. No, he wasn't. He was inside the building, I imagine.

Q. Is that when you just, as you said, slid over, got behind the wheel and left?

A. Yeah.

Q. Where did you go?

A. I went home.

Q. Do you recall how it was you got home?

A. I drove.

Q. Ok. Any difficulty driving home?

A. Not that I can think of.

Q. After you got home, where did you park your car?

A. Out in front.

Q. What did you do then?

A. I had gone up the stairs and undressed and climbed in bed.

Q. Okay. Now, as you went upstairs, did you have to flip on that light switch that you talked about?

A. No, I don't have to. I know it pretty well.

Q. Ok. So you came upstairs. You undressed in the dark?

A. Yes.

Q. And went to bed. Do you know what time it was you did all of that?

A. No, I don't.

44.    Ms. Slagle says she was awakened from her sleep in the Attic Apartment that early morning, hearing banging on the Attic Apartment door at the second-floor landing, the sound of breaking glass, the lock click on the door, and the sound of someone walking across the broken glass and up the last flight of stairs to the Attic Apartment. At trial, she then explained under direct examination:

Q. Now, up to that point in time, had you thought of leaving that bedroom or going anywhere when you heard the glass break?

A. I had thought about it, but I was so tired and I was so sound asleep that I just couldn't move.

Q. Were you so drunk that you couldn't move?

A. That's true.

Q. The fact that you had been drinking, did that seem to affect your ability to see, hear, and recognize all these sounds that you're telling us about?

A. No, it didn't.

45.    At trial, Ms. Slagle testified that it was Mr. Johnson who broke into the Attic Apartment and raped her there on June 11, 1989. At trial, Mr. Haggberg testified that he was out

of town at the time of the break-in and sexual assault.  These were all lies, aided or abetted by defendants' actions and inactions as pled herein.

**F.  Mr. Johnson's Actions the Early Morning of June 11, 1989.**

46.      Ms. Slagle had vomited in her car during the time Mr. Johnson was driving them from the Mayflower Bar to the "building," an after-hours club known as the Apollo, at 901 Snyder Street in Cheyenne.  Mr. Johnson went inside the Apollo to get some paper towels to help clean up the vomit.  When he returned outside, Ms. Slagle and her car were gone.  Mr. Johnson then walked home to his residence at 512 E. 2nd Street in Cheyenne, about a 35-minute walk.  He undressed and went to bed.

47.      Mr. Johnson's next recollection is being awakened by knocking at his front door. CPD patrol officer R. F. Bilkie (badge #P-5) ("Officer Bilkie") was there.  Officer Bilkie asked to be admitted to the residence.  Mr. Johnson let Officer Bilkie in.  Officer Bilkie's written report states, among other things, that a dialogue then ensued in which Mr. Johnson denied having any knowledge about a burglary and sexual assault earlier that morning.  Officer Bilkie then arrested Mr. Johnson, transported him to jail, booked him and jailed him.

**G.  Detective Stanford's Investigative Efforts.**

48.      Shortly after 5 a.m. on June 11, 1989, Detective Stanford had been informed by telephone by CPD patrol officers that Ms. Slagle had been sexually assaulted, vaginally penetrated, and that the suspect, Mr. Johnson, was in custody.  That morning, Stanford prepared and obtained search warrants to obtain sexual assault kit biological evidence from Mr. Johnson and to search Mr. Johnson's residence for clothing Ms. Slagle said he wore.  Detective Stanford executed upon both search warrants that day.  At Mr. Johnson's residence, Detective Stanford found no clothes matching those described by Ms. Slagle as being worn by Mr. Johnson, except a panama-style hat.  Stanford logged Mr. Johnson's rape kit biological samples, and two pairs of

shoes and two panama hats found at Mr. Johnson's residence, into the CPD Property Room under receipt #B 4304.

49.     Ms. Slagle and Mr. Haggberg met with Detective Stanford at the police station on June 12, 1989. To the best of Plaintiff's knowledge, Stanford made no tape recording of this critical first interview, or alternatively, if he made a tape recording, it has since been lost, destroyed, or overwritten. Detective Stanford neither prepared nor caused to be prepared a verbatim transcription of this critical first meeting. Instead, he wrote a sketchy 1-page report of information provided by Ms. Slagle and Mr. Haggberg at that time.

50.     In a subsequent recorded and partially transcribed interview of Ms. Slagle at the police station on June 15, 1989, she told Detective Stanford that she bit Mr. Johnson twice in his shoulder area while he was supposedly raping her. In fact, no such bite marks were noticed by the jailers who held Mr. Johnson or by anyone else who physically examined him. The supposed bite marks never existed.

51.     Detective Stanford interviewed Ms. Slagle a third time, on June 30, 1989. This interview was tape-recorded and a partial transcription of it made. In this interview, Ms. Slagle said that she and Mr. Haggberg had not had sex since June 1988, a year ago, because of complications arising, among other things, from STD surgery she had about that time. This recorded statement, known to Detective Stanford, was radically at odds with other information then known to him. Detective Stanford had obtained a medical record release from Ms. Slagle through which he had obtained the Memorial Hospital Emergency Department Physician's Note of Dr. Phillip Johnston who had performed the sexual assault physical examination of Ms. Slagle on the early morning of June 11, 1989. In that writing, Dr. Johnston reported that Ms. Slagle said that the last consenting sexual intercourse she had was about "3 wks ago."

52.     Detective Stanford and other CPD DOE defendants were recklessly and deliberately indifferent to investigating, or causing to be investigated, and independently corroborating, Mr. Haggberg's claimed alibi that he was on an employment assignment in Rock Springs, Wyoming, at the time of the alleged rape.  None of Mr. Haggberg's employer's personnel ever would, could or can now corroborate his alibi.  Detective Stanford recklessly and irresponsibly failed to corroborate Mr. Haggberg's alibi through any source other than Ms. Slagle and Mr. Haggberg himself.

53.     Detective Stanford testified in Mr. Johnson's criminal trial.  Among other things, he stated that sometime late Tuesday morning June 13, 1989---well after Officer Raybuck departed the then-uncontaminated Crime Scene bedroom[3] and well after Ms. Slagle and Mr. Haggberg re-occupied the Attic Apartment---Ms. Slagle telephoned him to tell him that she had discovered "additional evidence," eyeglasses, in the bedroom of the Attic Apartment. As parroted by Ms. Slagle under questioning by the prosecutor at Mr. Johnson's trial:

> Q. Okay. Did there come a time when you found some glasses in your apartment?
> A. Yes, it was.
> Q. When did that take place?
> A. Well, Detective Stanford---I believed it was Monday, but it was actually the following Tuesday, because Barney and I had gone down to the police department Monday and Barney spent all day Monday with me. The day that I had found the glasses Barney was at work.
> Q. That's Tuesday.  Tell me about Tuesday.  How did you find the glasses?
> A. Tuesday I [was] trying to pick my life back up, and I had gone into the bedroom and I had stripped the bed and had washed the sheets and

---

[3] Officer Raybuck reported on June 11, 1989: "I checked the bathroom and bedroom, also nothing usable found."

everything, and when I had put the blankets back on the bed and picked up
the clothes and everything I seen the glasses laying there. I went to pick
them up, and then I realized they must have been A.J.'s. So I called
Detective Stanford right away, and he came and picked them up.

\* \* \*

Q. Flashing back earlier, you testified that you were positive, without any
doubt, that you saw that I.D. card used downtown by A.J.

A. Yes, I did.

Q. And you testified that you were the last one out of that apartment,
flipping out that hall light as you went down when you were there earlier.

Y. Yes.

Q. Is it possible that I.D. was on the floor then?

A. No.

Q. How about the glasses? Is it possible that A.J. threw those glasses
into the corner of the room as he was walking out?

A. No, he didn't, because he had his glasses on at the bar. I recall him
taking them off one time and wiping them down.

Q. Have you ever seen A.J. without his glasses?

A. No.

54.  The eyeglasses supposedly found by Ms. Slagle in the Attic Apartment bedroom
were planted there after-the-fact by or on behalf of Ms. Slagle. It is presently unknown how Ms.
Slagle actually obtained the glasses and whether Mr. Haggberg assisted her in the ruse. It is
presently unknown whether Detective Stanford, or any other CDP personnel, played any role in
this deliberate fabrication of evidence. Plaintiff will seek to amend this Complaint after
appropriate discovery to attempt to get to the bottom of this evidence fabrication.

## V.    MR. JOHNSON'S FIRST CLAIM FOR RELIEF: VIOLATIONS OF 42 U.S.C. § 1983---SUPPRESSION OF MATERIAL EXCULPATORY EVIDENCE (*BRADY* CLAIMS AGAINST DEFENDANTS DOES 1-10 & DEFENDANT SPENCER)

55.     Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 54 above as if fully set forth herein.

56.     DOE defendants 2 through 10 are CPD personnel, whose names and nature of involvement are presently unknown to Plaintiff, who assisted or otherwise aided or abetted or conspired with Detective Stanford and/or Patrolman Spencer or others in sanitizing, suppressing, and/or withholding Crime Scene forensic photos from the prosecutor and thus from Mr. Johnson's criminal trial counsel.

57.     The missing Crime Scene forensic photographs, or some of them, were material exculpatory or impeaching evidence at least insofar as they or one or more of them would have enabled Plaintiff's criminal trial counsel to impeach the direct trial testimony of Ms. Slagle, Patrolman Spencer, Detective Stanford, and/or others.

58.     For example, Ms. Slagle's direct trial testimony was completely devoid of any mention or explanation whatsoever of the marijuana smoking and wine drinking she did in the Attic Apartment with Mr. Johnson before they departed to the Mayflower Bar and Cheyenne Club.  Some of the missing film and photographs would show signs of this activity in the Attic Apartment.  Some of the missing forensic film and photographs may also have enabled Mr. Johnson's criminal trial counsel to impeach Ms. Slagle's trial testimony about the location where she supposedly originally found the eyeglasses in the Attic Apartment.

59.     The missing forensic film and photographs, or one or more of them, would also have enabled Mr. Johnson's criminal trial counsel to impeach Defendant Spencer's direct trial

testimony about where Mr. Johnson's plastic-sleeved I.D. and Driver's License were originally found in the Attic Apartment.

60.     The aforesaid conduct of these defendants, and each of them, injured Plaintiff.

61.     The refusal and failure of these defendants, acting under color of state law, to disclose the missing Crime Scene forensic photographs, or some of them, to Mr. Johnson's criminal trial counsel was a direct violation of his clearly established constitutional rights under the Fourth and Fourteenth Amendments to full disclosure by government actors of all material exculpatory and impeaching evidence, as described in *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny.  The missing and undisclosed Crime Scene forensic photos, or some of them, resulted in Mr. Johnson not getting a "fundamentally fair" criminal trial, *see United States v. Bagley* 473 U.S. 667, 675 (1985).

62.     The aforesaid conduct of Detective Stanford, Defendant Spencer, and DOES 2 through 10 and each of them, was malicious and oppressive and warrants the award of punitive damages.

63.     As a proximate result of the misconduct of Detective Stanford, Defendant Spencer, and DOES 2 through 10 and each of them, Plaintiff was severely injured and damaged and is entitled to judgment and damages as is more specifically detailed in that section of this Complaint denominated as "Prayer for Relief."

### VI.     MR. JOHNSON'S SECOND CLAIM FOR RELIEF: VIOLATIONS OF 42 U.S.C. § 1983---FAILURES TO PRESERVE/DISCLOSE APPARENT EXCULPATORY & POTENTIALLY USEFUL EVIDENCE (*TROMBETTA* & *YOUNGBLOOD* CLAIMS AGAINST DEFENDANTS DOES 1-10 & DEFENDANT SPENCER)

64.     Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 63 above as if fully set forth herein.

65.     The missing Crime Scene forensic film and photographs, or some of them, were apparent exculpatory and potentially useful evidence insofar as they or one or more of them would have enabled Plaintiff's criminal trial counsel to impeach the direct trial testimony of Ms. Slagle, Patrolman Spencer, Detective Stanford, and/or others.

66.     Detective Stanford, defendants DOE 2 through 10 and/or Defendant Spencer, and each of them, acted in bad faith in concealing, failing to preserve, destroying, withholding, and/or failing to disclose these forensic film and photographs, or one or more of them.

67.     By its very nature, a full and complete set of the first-responder Crime Scene film and/or photographic prints in this case was itself apparent exculpatory and potentially useful evidence to Mr. Johnson's criminal trial counsel.  Depending on their contents, missing individual Crime Scene film and photographs taken by Officer Raybuck also had apparent exculpatory and potentially useful value to Mr. Johnson's defense.  Missing Crime Scene forensic film and photographs subsequently taken at the Attic Apartment may also have had apparent exculpatory and potentially useful value to the defense at Mr. Johnson's criminal trial.

68.     The refusal and failure of these defendants, acting under color of state law, to preserve and disclose the missing Crime Scene forensic film and photographs, or some of them, to Mr. Johnson's criminal trial counsel was a direct violation of his clearly established constitutional rights under the Fourth and Fourteenth Amendments to preservation and disclosure by the police of "evidence that might be expected to play a significant role in the suspect's defense[,]" *California v. Trombetta*, 467 U.S. 479, 488 (1984).  The Constitution imposes a clear "obligation" on the police "to preserve [and reveal] evidence... [that] could form the basis for exonerating the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

69.     The aforesaid conduct of these defendants, and each of them, injured Plaintiff.

70.     The aforesaid conduct of Detective Stanford, Defendant Spencer, and DOES 2

through 10 and each of them, was malicious and oppressive and warrants the award of punitive

damages.

71.     As a proximate result of the misconduct of Detective Stanford, Defendant

Spencer, and DOES 2 through 10 and each of them, Plaintiff was severely injured and damaged

and is entitled to judgment and damages as is more specifically detailed in that section of this

Complaint denominated as "Prayer for Relief."

## VII.   MR. JOHNSON'S THIRD CLAIM FOR RELIEF:  VIOLATIONS OF 42 U.S.C. § 1983---DELIBERATE FABRICATION OF EVIDENCE (AGAINST DEFENDANT SPENCER AND DOES 11-15)

72.     Plaintiff hereby incorporates all statements and allegations contained in

paragraphs 1 through 71 above as if fully set forth herein.

73.     Plaintiff is informed and believes, and thereon alleges, that on June 11, 1989,

Defendant Spencer removed Mr. Johnson's Plastic Sleeve from the Attic Apartment coffee table

when Defendant Spencer did his first walk-through of the Attic Apartment living room to check

if an intruder was there; shortly thereafter, when endeavoring to learn the identity of the intruder

and before Ms. Slagle in any way generally or specifically identified the man who "hurt" her in

the Attic Apartment that early morning, Patrolman Spencer showed Ms. Slagle Mr. Johnson's

I.D. or Driver's License in the Plastic Sleeve, recklessly and carelessly or with deliberate

indifference or willful blindness to Mr. Johnson's federally protected rights, prompting Ms.

Slagle at that time to affirmatively assert Mr. Johnson was that man.

74.     Thereafter, Defendant Spencer falsely reported that he found the Plastic Sleeve at

the foot of the Attic Apartment bathroom door, falsely reported that Ms. Slagle identified the

intruder by nickname or initials before he showed Mr. Johnson's I.D. or Driver's License picture

to Ms. Slagle, and falsely testified under oath at trial to the same effect.  Defendant Spencer's

knowing efforts to secure a suspect identification by fabricating evidence or by otherwise corruptly influencing the alleged victim, a key witness, is not entitled to qualified immunity. These and other actions of Defendant Spencer violated Mr. Johnson's clearly established rights under the Fourth and Fourteenth Amendments to a fair trial and to be convicted only upon reliable evidence.

75.     Plaintiff is informed and believes, and thereon alleges, that defendants DOES 11-15, and each of them, aided or abetted or conspired with Defendant Spencer to fabricate evidence against Mr. Johnson, all to his detriment.

76.     The aforesaid conduct of Defendant Spencer and DOES 11-15 each of them, was malicious and oppressive and warrants the award of punitive damages.

77.     As a proximate result of the misconduct of Defendant Spencer and DOES 11 through 15 and each of them, Plaintiff was severely injured and damaged and is entitled to judgment and damages as is more specifically detailed in that section of this Complaint denominated as "Prayer for Relief."

## VIII.    MR. JOHNSON'S FOURTH CLAIM FOR RELIEF: VIOLATIONS OF 42 U.S.C. § 1983---SELECTIVE PRESERVATION AND DISCLOSURE OF EVIDENCE (MONELL CLAIMS AGAINST DEFENDANT CITY)

78.     Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 77 above as if fully set forth herein.

79.     Plaintiff is informed and believes, and on that basis alleges, that in 1989 at the time of the investigation and prosecution of the crimes of which Mr. Johnson was accused and convicted, CPD had no written policies or procedures, or had constitutionally inadequate written policies or procedures:

a.      Requiring the assigned investigating officers or one of them, or one of their

superiors or other designated CPD personnel, to disclose to and provide to the prosecutor at least one full set of all CPD forensic photographs taken of a crime scene;

b.   Requiring the assigned investigating officers or one of them, or one of their superiors or other designated CPD personnel, to make, maintain and preserve a case-specific chain-of-custody log or record for each CPD cassette of exposed undeveloped negative film taken of a crime scene;

c.   Requiring the assigned investigating officers or one of them, or one of their superiors or other designated personnel, to make, maintain, and preserve a case-specific chain-of-custody log or record for all developed negative film exposures of a crime scene;

d.   Requiring the assigned investigating officers or one of them, or one of their superiors or other designated CPD personnel, to make, maintain and preserve a case-specific chain-of-custody log of the number of prints made of crime scene photographs;

e.   Requiring CPD Property Room custodians or one of them to obtain, maintain, identify, log, group case-by-case, and permanently preserve each and every developed negative film exposure of a crime scene taken by or on behalf of CPD;

f.   Requiring CPD Property Room custodians to obtain, maintain, identify, log, group case-by-case, and permanently preserve one complete set of each and every photographic print of a crime scene made by or on behalf of CPD; and

g.   Prohibiting the destruction of any undeveloped and developed negative film of a crime scene.

80.    All or some of the constitutionally inadequate written policies or procedures as alleged herein was a moving force in causing constitutional injury to Mr. Johnson as pled herein.

81.    Alternatively, Plaintiff is informed and believes, and on that basis alleges, that in 1989 at the time of the investigation and prosecution of the crimes of which Mr. Johnson was accused and convicted, CPD inadequately monitored and enforced its written policies or procedures:

a.    Requiring the assigned investigating officers or one of them, or one of their superiors or other designated CPD personnel, to disclose to and provide to the prosecutor at least one full set of all CPD forensic photographs taken of a crime scene;

b.    Requiring the assigned investigating officers or one of them, or one of their superiors or other designated CPD personnel, to make, maintain and preserve a case-specific chain-of-custody log or record for each CPD cassette of exposed undeveloped negative film taken of a crime scene;

c.    Requiring the assigned investigating officers or one of them, or one of their superiors or other designated personnel, to make, maintain, and preserve a case-specific chain-of-custody log or record for all developed negative film exposures of a crime scene;

d.    Requiring the assigned investigating officers or one of them, or one of their superiors or other designated CPD personnel, to make, maintain and preserve a case-specific chain-of-custody log of the number of prints made of crime scene photographs;

e.    Requiring CPD Property Room custodians or one of them to obtain, maintain,

identify, log, group case-by-case, and permanently preserve each and every

developed negative film exposure of a crime scene taken by or on behalf of CPD;

f.    Requiring CPD Property Room custodians to obtain, maintain, identify, log,

group case-by-case, and permanently preserve one complete set of each and every

photographic print of a crime scene made by or on behalf of CPD; and

g.    Prohibiting the destruction of any undeveloped and developed negative film of a

crime scene.

82.    All or some of the constitutionally inadequate written policies or procedures as

alleged herein was a moving force in causing constitutional injury to Mr. Johnson as pled herein.

83.    Plaintiff is informed and believes, and on that basis alleges, that CPD custom or

practice in 1989 was for the assigned investigating patrolman and/or detective and/or CPD

supervisor to maintain in his/her own case investigation file, on a temporary basis or until

completion or closure of the case, the negatives of the crime scene photographs taken by CPD

personnel, thereby allowing for selective preservation and giving of the negatives to a Property

Room custodian for permanent safekeeping and preservation, all or some of which was a moving

force in causing constitutional injury to Mr. Johnson as pled herein.

84.    Plaintiff is informed and believes, and on that basis alleges, that CPD custom or

practice at the time was for investigating patrolman and/or detective and/or CPD supervisor to

maintain in his/her own case investigation file, on a temporary basis or until completion or

closure of the case, the prints of the crime scene photographs taken by CPD personnel, thereby

allowing for selective giving, if any, of one or more such prints to the prosecutor and to defense

counsel, all or some of which was a moving force in causing constitutional injury to Mr. Johnson

as pled herein.

85.     Defendant City through CPD purposefully, or with reckless or deliberate indifference, or with willful blindness, failed to have adequate policies, rules, procedures, customs or practices in place as of 1989, or failed to monitor or enforce the same, resulting in violation of Mr. Johnson's constitutional rights.

86.     Defendant City through CPD, through action and/or inaction, directly and proximately set in motion a series of acts by Detective Stanford and/or Patrolman Spencer and/or others which these defendants knew or should have known would cause constitutional injuries to Mr. Johnson.

87.     Defendant City through CPD made a deliberate and conscious choice among various alternatives as pled herein, resulting in errors of constitutional magnitude in the investigation and conviction of Mr. Johnson, all directly caused by one or more of the crime investigators and/or others suppressing and/or failing to preserve photographic evidence helpful or potentially helpful to Mr. Johnson's criminal defense.

88.     The aforesaid conduct of Defendant City injured Plaintiff.

89.     As a proximate result of the misconduct of Defendant City, Plaintiff was severely injured and damaged and is entitled to judgment and damages as is more specifically detailed in that section of this Complaint denominated as "Prayer for Relief."

## IX. MR. JOHNSON'S FIFTH CLAIM FOR RELIEF: VIOLATIONS OF 42 U.S.C. § 1983—CONSTITUTIONALLY INADEQUATE TRAINING AND/OR SUPERVISION (CANTON CLAIMS AGAINST DEFENDANT CITY; INDIVIDUAL CLAIMS AGAINST DOES 16-20)

90.     Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 89 above as if fully set forth herein.

91.     Defendants DOES 16-20 are sued here in their individual and official capacities. The conduct of these defendants, sued in their official capacities, bear upon the entity liability of

Defendant City for its failure to train and/or supervise CPD personnel. DOES 16 through 20,
and each of them, were individually responsible for the training and/or supervision of CPD
personnel as alleged herein.

92.     As of 1989, CPD detectives and patrolmen were trained by utilizing a
combination of on-the-job training and classroom training, if any. Mr. Johnson is informed and
believes, and on that basis alleges, that Detective Stanford had little or no classroom detective
training as of the time he was assigned to investigate the crimes of which Mr. Johnson was
accused, charged, and convicted. As of June 1989, Detective Stanford had been a CPD peace
officer slightly more than 4 years and had approximately 6 months of detective on-the-job or in-
service training.

93.     In Detective Stanford's investigation of accusations that Mr. Johnson had broken
into the Attic Apartment and sexually assaulted Ms. Slagle, Detective Stanford did not conform
critical parts of his investigative conduct to standard police procedure methods, nor even to his
basic training regarding peace officer investigative conduct. As of that time, Defendant City,
through CPD, had inadequately trained and monitored and supervised Detective Stanford in his
detective actions on its behalf in this case. The same holds for Defendant Spencer in his patrol
officer conduct in this case.

94.     Defendant City through CPD, and DOES 16 through 20 and each of them, had
responsibility to assign a competent detective to conduct the investigation against Mr. Johnson,
had the power and authority to assign and to train Detective Stanford for such investigation, and
had responsibility to monitor and to supervise Detective Stanford's conduct of the investigation.
Defendant City through CPD, and DOES 16 through 20 and each of them, knew or with
reasonable diligence should have known of Detective Stanford's lack of adequate training and

experience to undertake investigation of and/or recommendation of charges against Mr. Johnson. The conduct and inaction of each of these policymakers or supervisors relating to such training, assignment, monitoring, and supervision of Detective Stanford and Patrolman Spencer demonstrated a grossly negligent, reckless, callous or deliberate indifference, or willful blindness, to violation of Mr. Johnson's federal rights as pled herein.

95.    Given his inadequate training and experience, particularly in view of the demonstrated lack of credibility of the suspected victim on critical issues, Detective Stanford was unfit for conducting the investigation and unfit to make charging recommendations without very substantial active participation, or very active and critical oversight, of the investigation by another appropriately trained and experienced CPD peace officer. Defendant City through CPD, and DOES 16 through 20 and each of them, purposefully, or with reckless or deliberate indifference, or with willful blindness, failed to give or provide such guidance, supervision, monitoring, oversight and control of Detective Stanford's conduct and of Patrolman Spencer's conduct of that investigation, resulting in violation of Mr. Johnson's constitutional rights.

96.    Defendant City through CPD, and DOES 16 through 20 and each of them, through action and inaction, directly and proximately set in motion a series of acts by Detective Stanford and/or Patrolman Spencer and/or others which these defendants knew or should have known would cause constitutional injuries to Mr. Johnson.

97.    Defendant City through CPD, and DOES 16 through 20 and each of them, made a deliberate and conscious choice among various alternatives when assigning Detective Stanford and Patrolman Spencer to the investigation, or when ratifying the assignment, or when failing to train and supervise Detective Stanford and Patrolman Spencer adequately therefor, resulting in errors of constitutional magnitude in the investigation and conviction of Mr. Johnson, all directly

caused by one or more of the crime investigators fabricating evidence and/or suppressing, and/or failing to preserve photographic evidence helpful or potentially helpful to Mr. Johnson's defense.

98.     In light of the duties assigned CPD detectives, including but not limited to Detective Stanford, the need for more and different training and/or supervision in investigations of alleged interracial rape was obvious, and with the exercise of reasonable care should have been obvious to Defendant City, and to DOES 16 through 20 and each of them, as applied to the investigation and prosecution of Mr. Johnson. Defendant City, and DOES 16 through 20 and each of them, were recklessly, callously, or deliberately indifferent, or willfully blind, to the need for such supervision and for the completion of such training by Detective Stanford, prior to undertaking or completing such investigations, given that the inadequacy or absence of such supervision and/or training was so likely to result in violation of a non-Caucasian suspect's constitutional rights. At all relevant times, Defendant City, and DOES 16 through 20 and each of them, failed to train and/or supervise the CPD detectives adequately for and in the investigation of alleged interracial rape cases, as well as others. The inadequacy and absence of such supervision and/or training did in fact result in violation of Mr. Johnson's constitutional rights.

99.     The foregoing conduct of DOES 16 through 20, and each of them sued in his/her individual capacity, was malicious and oppressive, warranting the award of punitive damages against each of them.

100.     As a proximate result of the misconduct of Defendant City and DOES 16 through 20, Plaintiff was severely injured and damaged and is entitled to judgment and damages as is more specifically detailed in that section of this Complaint denominated as "Prayer for Relief."

## X.   PRAYER FOR RELIEF

101.    Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 100 above as if fully set forth herein.

102.    Plaintiff seeks judgment as follows:

a.      Compensatory, general, and special damages against all defendants, and each of them, in an amount to be proven at trial, including but not limited to damages for physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and loss of earnings and earning capacity;

b.      Punitive and exemplary damages against all defendants, except Defendant City;

c.      Prejudgment interest according to proof;

d.      Reasonable attorneys' fees and expenses of litigation as allowed by 42 U.S.C. § 1988 and other applicable law;

e.      Costs of suit reasonably incurred;

f.      That Defendant City be required to pay any judgment pursuant to law;

g.      That Wyoming, pursuant to State law governing its indemnification obligations for sworn peace officers, pay any judgment against any CPD personnel or his personal representative as alleged herein.

Dated:  April 17, 2017.

ANDREW J. JOHNSON
Plaintiff

By:     _____
Thomas N. Long
Aaron J. Lyttle
LONG REIMER WINEGAR
BEPPLER LLP
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82003
Telephone: 307.635.0710
tlong@lrw-law.com

Robert P. Schuster
Bradley L. Booke
Robert P. Schuster, P.C.
250 Veronica Lane, Suite 204
P.O. Box 13160
Jackson, Wyoming 83002
(307) 732-7800
bob@bobschuster.com

Laurence O. Masson
LAW OFFICE OF LAURENCE O.
MASSON
2625 Alcatraz Ave., No. 206
Berkeley, California 94705
Telephone: 510.735.9691
lomlex@gmail.com
(*Pro Hac Vice Applicant*)

Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff Andrew J. Johnson hereby demands that all issues regarding all claims for relief above be tried by a jury.

Dated:  April 17, 2017.

ANDREW J. JOHNSON
Plaintiff

By:  _Amy J. Lyttle_

Thomas N. Long
Aaron J. Lyttle
LONG REIMER WINEGAR
BEPPLER LLP
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82003
Telephone: 307.635.0710
tlong@lrw-law.com
alyttle@lrw-law.com

Robert P. Schuster
Bradley L. Booke
Robert P. Schuster, P.C.
250 Veronica Lane, Suite 204
P.O. Box 13160
Jackson, Wyoming 83002
(307) 732-7800
bob@bobschuster.com

Laurence O. Masson
LAW OFFICE OF LAURENCE O.
MASSON
2625 Alcatraz Ave., No. 206
Berkeley, California 94705
Telephone: 510.735.9691
lomlex@gmail.com
(*Pro Hac Vice Applicant*)

Attorneys for Plaintiff